**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Megan L Caley, | No. CV-22-01735-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of her applications for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 15), the Commissioner's answering brief (Doc. 17), and Plaintiff's reply brief (Doc. 18), as well as the Administrative Record (Doc. 13, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.  Procedural History

On June 2, 2020, Plaintiff filed applications for disability and disability insurance benefits and supplemental security income, alleging disability beginning on December 16, 2016. (AR at 15.) The Social Security Administration ("SSA") denied Plaintiff's applications at the initial and reconsideration levels of administrative review. (*Id.*) On September 22, 2021, the ALJ held a telephonic hearing. (*Id.*) On September 28, 2021, Plaintiff submitted a post-hearing brief. (*Id.*) On November 1, 2021, the ALJ issued an unfavorable decision. (*Id.* 15-31.) The Appeals Council later denied review. (*Id.* at 1-3.)

II.     The Sequential Evaluation Process And Judicial Review

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where she determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Act through March 31, 2018 and had not engaged in substantial, gainful work activity since the alleged onset date. (AR at 18.) Next, the ALJ found that Plaintiff had the following severe impairments: "obesity, migraine without aura, cervical radiculopathy, degenerative disc disease of the thoracic spine status post compression fractures, degenerative disc disease of the lumbar spine, osteoarthritis of the bilateral knees, mood disorder, major depressive disorder, anxiety disorder, panic disorder." (*Id.* at 18-19, record citations omitted.)[1] Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listing. (*Id*. at 19-22.) Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the following additional limitations: can occasionally climb of ramps of stairs, never climb of ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawling; must avoid concentrated exposure to extreme cold, to extreme heat, to humidity, and to fumes, odors, gases and other pulmonary irritants; even moderate exposure to hazards such as operational control of moving machinery and unprotected heights; requires use of a single point cane to ambulate any distance; can understand, remember, and carry out simple, routine tasks, no interaction with the general public, only occasional work-related, non-personal, non-social interaction with co-workers and supervisors, and is limited to jobs requiring only simple work-related decisions however can keep pace sufficient to complete tasks and meet quotas typically found in unskilled work.

(*Id.* at 22.)

As part of this RFC determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that although Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

---

[1] The ALJ also noted that Plaintiff presented evidence of hypertension, tinnitus and hearing loss in right ear, and vestibular disequilibrium but deemed those impairments "non-severe." (AR at 19.) Additionally, although Plaintiff testified that she suffered from asthma, arthritis in hands, and plantar fasciitis, the ALJ concluded those conditions were "not medically determinable impairments because there is no work up regarding them to support them." (*Id.*)

consistent with the medical evidence and other evidence in the record during the relevant time period for the reasons explained in this decision." (*Id.* at 23.) The ALJ also evaluated opinion evidence from various medical sources, but the ALJ's extensive assessment of those opinions (*id.* at 25-28) is not relevant to the issues presented in this appeal.

Based on the testimony of a vocational expert ("VE"), the ALJ concluded that although Plaintiff was not capable of performing her past relevant work as a collection clerk, receptionist, or file clerk, she was capable of performing two other jobs that exist in significant numbers in the national economy: (1) final assembler, optical goods (approximately 35,000 jobs available nationally); and (2) table worker (approximately 50,000 jobs available nationally). (*Id.* at 28-30.)[2] Thus, the ALJ concluded that Plaintiff is not disabled. (*Id.* at 30-31.)

IV. Discussion

Plaintiff presents only one issue on appeal—whether "the defendant met her burden of establishing the existence of a significant number of jobs within the plaintiff's [RFC]." (Doc. 15 at 2.) As a remedy, Plaintiff seeks a remand for further step-five proceedings "based on the previously assessed RFC." (*Id.* at 14-15.)

A. **Relevant Additional Background**

As noted, a VE testified during Plaintiff's hearing on September 22, 2021. (AR at 64-72.) After the ALJ defined Plaintiff's RFC, the VE opined that a person with that RFC would be unable to perform Plaintiff's past work. (*Id.* at 65-66.) However, when asked whether there would be "any sedentary, unskilled jobs that could be done" by a person with Plaintiff's RFC, the ALJ affirmed that such jobs do exist and identified three of them: (1) "document preparer or a document scanner," "DOT number of 249.587-018," "with national numbers of about 90,000"; (2) "final assembler," "DOT code 713.687-018," "[n]ational numbers there would be approximately 35,000"; and (3) "table

---

[2] The ALJ also clarified that although the VE had identified a third job (document preparer) that Plaintiff could perform, the ALJ had "excluded this job" "in an abundance of caution" because "as a job with reasoning level 3 [it] may not comport to the mental limits in the . . . RFC." (AR at 16.)

worker/inspector," "DOT number of 739.687.182," "the national numbers there would be approximately 50,000." (*Id.* at 66-67.)

The ALJ then allowed Plaintiff's counsel to question the VE. First, Plaintiff's counsel asked about the availability of jobs under a hypothetical, modified version of the RFC. (*Id.* at 67-68.) Next, Plaintiff's counsel asked: "[C]ould you tell us how or what is the evidentiary basis for the job numbers . . . that you provided? How did you reach those numbers?" (*Id.* at 68.) The VE responded: "It's a combination of things. The primary resource is the United States Department of Labor, Division of Occupational Employment Statistics, I believe it's 2017. . . . I also, in conjunction with those, I use the SkillTRAN Job Browser Pro, so a combination of information from that as well as the document I just cited." (*Id.*)

Next, Plaintiff's counsel asked for more detail on how, exactly, the VE concluded that 90,000 document preparer/scanner jobs exist. (*Id.* at 68-69.) The VE responded: "It's a combination of information from the Job Browser Pro, SkillTRAN and/or the United States Department of Labor, Division of Occupational Employment Statistics." (*Id.* at 69.) Plaintiff's counsel then asked: "Well, do[es] . . . any of that data say that there's 90,000 of document preparers in the nation?" (*Id.*) The VE responded: "I believe it does, yes. I mean I've been using that. It's a spreadsheet I have and so I've been using it. It's not a unique odd lot job. In fact, it's very common converting paper to electronics found in many different industries." (*Id.*) Plaintiff's counsel then asked: "Well, isn't that within an SOC code?[3] Is that how that works and that the SOC code is a larger number and then you have to figure out where the document preparer is found in that number? (*Id.*) The VE responded: "I'm not sure. I don't know. It could be but then, again, when we look at groups of jobs, there are other jobs that would be far less common than that, so it's difficult to break that specific one down. Mine is an estimate, but I think is reasonably accurate." (*Id.*) Plaintiff's counsel then asked the VE to explain how "if someone were trying to

---

[3] In Social Security parlance, the "SOC" refers to the Bureau of Labor Statistics' Standard Occupational Classification codes. *Wischmann v. Kijakazi*, 68 F.4th 498, 502 (9th Cir. 2023).

- 5 -

duplicate your effort, you know, how it could be duplicated to find 90,000 jobs." (*Id.* at 69-70.) However, before the VE answered, the ALJ stated: "Counsel, do you have a question because we're asking the same thing over and over again. . . . The VE explained his methodology. I mean you got [to] give us more direct question[s] or we're going to move on here. We can't spend all day on this." (*Id.* at 70.) Plaintiff's counsel responded: "Okay. All right. All right. Okay. I don't have any other questions then." (*Id.*)

On September 28, 2021, Plaintiff's counsel submitted a post-hearing brief. (*Id.* at 392-406.) In the introductory section of the brief, counsel explained that Plaintiff was raising two objections: (1) an objection to the "job numbers for all jobs provided by the VE"; and (2) an objection to the "inclusion of Document Preparer" in the list of jobs Plaintiff could perform. (*Id.* at 392.) As for the first objection, counsel clarified that the basis for the objection was that the VE's job-numbers testimony was "unsupported by reliable data." (*Id.*) More specifically, counsel asserted that "[f]urther research has revealed that the actual job number estimates produced by Job Browser Pro's most current version, version 1.7.3.1, are much lower than the job number estimates reported by [the VE]. As the attached screenshots from Job Browser Pro demonstrate, SkillTRAN's methodology actually estimates the existence of 16,957 Document Preparer jobs, 24 Final Assembler jobs, and 962 Table Worker jobs." (*Id.*) Additionally, counsel asserted that "[t]he attached screenshots from the Department of Labor's Bureau of Labor Statistics (2017 Occupational Employment and Wage Statistics—OEWS) also do not support the vocational expert's job number estimates, as it is highly improbable that the identified occupations comprise such a large percentage of the identified OEWS groups." (*Id.*) Various screenshots were enclosed as attachments to the brief. (*Id.* at 395-406.)

As for the second objection, counsel clarified that the basis for the objection was that the Document Preparer job was "not responsive to the hypothetical." (*Id.* at 392.) More specifically, counsel argued that Document Preparer is "a Reasoning Level 3 job" and is thus inconsistent with the ALJ's "hypothetical which asked for jobs requiring only simple repetitive tasks . . . and simple workplace decisions." (*Id.* at 393.)

In the introductory section of the final decision issued on November 1, 2021, the ALJ acknowledged the objections raised in counsel's post-hearing brief and resolved them as follows: "As to job numbers, the objection is overruled as the undersigned finds the vocational expert's methodology sound and in keeping with the Social Security Administration's policy.  With respect to the Document Preparer job, in an abundance of caution, the undersigned has excluded this job as a job with reasoning level 3 may not comport to the mental limits in the [RFC].  However, even when excluded, . . . there are still two viable jobs that may be done with the limits in the RFC, therefore an unfavorable decision is still warranted." (*Id.* at 16.)  Elsewhere in the decision, the ALJ elaborated: "[T]he undersigned has determined that the [VE's] testimony is consistent with the information contained in the DOT and the record.  To the extent the [VE's] testimony is inconsistent with the DOT, the undersigned accepts his uncontradicted opinion based on his years of professional knowledge, observation, and experience." (*Id.* at 30.)

### B.     The Parties' Arguments

Plaintiff identifies the issue on appeal as whether "the defendant met her burden of establishing the existence of a significant number of jobs within the plaintiff's [RFC]." (Doc. 15 at 2.)  As an initial matter, Plaintiff argues that, under *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019), Social Security claimants have the right to "probe the strength of [VE] testimony by" asking questions about the VE's methodology.  (Doc. 15 at 8-9.)  Plaintiff argues that the ALJ interfered with this right by "curtail[ing] the questioning of the VE by [Plaintiff's] attorney before the attorney could get a sensible answer out of [the VE] about the methodology he used to derive his job number estimates." (*Id.*)  As for the substance of the challenged testimony, Plaintiff argues that the VE's assertion that there are 35,000 "final assembler, optical goods" jobs in the national economy "is absurd on its face" because, according to Plaintiff's understanding of the production rate of eyeglass assemblers, "35,000 such workers would produce over a billion pairs of glasses per year . . . . In an age when nearly all eyeglasses are assembled in Italy or China, this testimony is simply untenable." (*Id.* at 9-10.)  Plaintiff further argues that although the VE testified

1  that the 35,000-job figure was derived from the 2017 Occupational Employment Statistics
2  from the Department of Labor and SkillTRAN's Job Browser Pro, the materials attached
3  to the post-hearing brief undermine this contention. (*Id.* at 9-12.) Plaintiff raises similar
4  objections to the VE's contention that there are 50,000 jobs in the national economy for
5  "workers inspecting linoleum," arguing that "Job Browser Pro estimates the existence of
6  only 962 of these jobs" and "the 2017 OES data" only shows that there are 537,500 workers
7  who collectively hold a much larger group of jobs. (*Id.* at 12-13.) Plaintiff concludes that
8  reversal is required because, as in *White v. Kijakazi*, 44 F.4th 828 (9th Cir. 2022), the ALJ
9  made no attempt to resolve the conflicts in the evidence. (*Id.* at 13-14.)

The Commissioner argues that the ALJ's decision should be affirmed. (Doc. 17.) According to the Commissioner, although "Plaintiff argues that the [VE's] numbers differ from those she arrived at, Plaintiff merely submitted raw data from Job Browser Pro and Occupational Employment and then offered her own lay interpretation of those numbers. However, the vocational expert . . . testified that his job numbers were based upon a combination of information from the DOT, SkillTran, Job Browser Pro, and his own expertise." (*Id.* at 3-4.) The Commissioner likens this case to *Wischmann v. Kijakazi*, 68 F.4th 498 (9th Cir. 2023), and argues that affirmance is required because Plaintiff's purportedly contradictory evidence "failed to replicate the methodology used by the vocational expert." (*Id.* at 4.) The Commissioner also argues that the ALJ did not impermissibly curtail counsel's examination of the VE. (*Id.* at 4-5.)

In reply, Plaintiff begins by arguing that the ALJ's curtailment of cross-examination was improper because the VE never actually explained his methodology for calculating the job numbers: "'A combination of things' and 'a combination of information' does not constitute a methodology." (Doc. 18 at 2-3.) For similar reasons, Plaintiff argues that the ALJ erred by concluding that the VE's methodology was "sound" and consistent with SSA policy. (*Id.* at 3.) Finally, Plaintiff argues that *Wischmann* is distinguishable because the VE in that case used a comprehensible methodology. (*Id.* at 4.)

…

C. **Analysis**

The Court construes Plaintiff's briefing as raising a pair of related but distinct challenges to the ALJ's step-five analysis.

First, Plaintiff contends that the VE's testimony regarding the number of available final assembler and table worker jobs (*i.e.*, approximately 35,000 and 50,000) was legally insufficient, even before any consideration is given to the post-hearing evidence she submitted on that topic, in light of VE's failure to identify the methodology he followed when calculating those figures and the ALJ's refusal to allow Plaintiff's counsel to cross-examine the VE regarding his methodology. (Doc. 18 at 3 ["Because [the VE] failed to *explain* his methodology despite multiple requests by [Plaintiff's] hearing attorney, the VE's testimony was not compliant with SSA policy . . . ."].)

If the Court were writing on a blank slate, it might be inclined to agree with Plaintiff's arguments on this point. Although the VE identified the evidentiary sources on which he relied when formulating his job-number estimates—that is, (1) the 2017 version of the "United States Department of Labor, Division of Occupational Employment Statistics," (2) "the SkillTRAN Job Browser Pro," and (3) "a spreadsheet I have" (AR at 68-69)—the VE never went further and explained his method for utilizing the information in those materials to come up with a bottom-line estimate as to the number of available jobs. Having reviewed the transcript of the VE's hearing testimony, the Court still has no idea how the VE derived the job figures of 35,000 and 50,000 to which he testified. At least in the Seventh Circuit, this sort of omission might require reversal. *See, e.g.*, *Ruenger v. Kijakazi*, 23 F.4th 760, 762-63 (7th Cir. 2022) (reversing where the "VE failed to set forth an understandable methodology" when asked to explain how she used the information in the cited evidentiary sources to calculate the opined-to job figures and explaining that because "the way in which the vocational expert compiled her job numbers is unclear . . . , we cannot review her methodology, let alone confirm that it was reliable"); *Jonathan W. v. Kijakazi*, 2023 WL 5748363, *5 (N.D. Ill. 2023) ("It was the ALJ who failed to elicit testimony from the VE about her methodology, despite Plaintiff's counsel raising the issue

of the VE's methodology before, during, and after the hearing before the ALJ. The ALJ overruled these objections, despite failing to elicit testimony from the VE on precisely what method (not sources) she used to estimate her job numbers and why she believed that method produced reliable job number estimates. The ALJ's questioning of the VE revealed only that the VE relied on her own experience, the DOT, the BLS, and Job Browser Pro to provide the job number estimates, that she believed these sources were widely used by VEs and reliable, and that she received training on using the Job Browser Pro. This is not enough under the substantial evidence standard."); *Polly v. Astrue*, 2009 WL 1766842, *8 (N.D. Ind. 2009) ("[T]he ALJ a[f]firmatively prevented Polly's counsel from conducting an inquiry, interrupting counsel's question to the VE about how he arrived at the number of hand packager jobs and conclusorily deeming the VE's testimony sufficient. Because the record is devoid of any inquiry by the ALJ into the reliability of the VE's methodology, a remand is required on this issue.").

On the other hand, the Court is not writing on a blank slate. The Ninth Circuit has "long held that in the absence of any contrary evidence, a vocational expert's testimony is one type of job information that is regarded as inherently reliable; thus, there is no need for an ALJ to assess its reliability. Given its inherent reliability, a qualified vocational expert's testimony as to the number of jobs existing in the national economy that a claimant can perform is ordinarily sufficient by itself to support an ALJ's step-five finding." *Ford v. Saul*, 950 F.3d 1141, 1160 (9th Cir. 2020). *See also Wischmann*, 68 F.4th at 501-02 ("A VE's estimate of the number of jobs available in the national economy is informed by the VE's experience and expertise, and may be based upon not only publicly available sources but also information obtained directly from employers and data otherwise developed from the VE's own experience in job placement or career counseling. . . . [U]ncontradicted VE job-numbers testimony [is] inherently reliable and ordinarily sufficient by itself to support an ALJ's step-five finding.") (cleaned up); *White*, 44 F.4th at 834-35 (noting that "VEs may use a wide range of data sources and methodologies to generate job-number estimates" and that "the Supreme Court recently held that VE job-numbers testimony may constitute

substantial evidence supporting a finding of no disability even if the VE refuses to disclose the specific, non-public data sources on which the estimates were based") (cleaned up); *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1191, 1194 (9th Cir. 2022) ("In accordance with Social Security Act regulations, an ALJ is entitled to rely on a VE's testimony to support a finding that the claimant can perform occupations that exist in significant numbers in the national economy.") (citation omitted). Thus, under Ninth Circuit law, the ALJ could accept and rely upon the VE's job-number calculations in this case even though the VE never explained his methodology for calculating those figures. The ALJ specifically identified the VE's "professional knowledge, observation, and experience" as one of the reasons for accepting the VE's testimony on this topic (AR at 30) and that finding was alone sufficient.[4]

The Supreme Court's decision in *Biestek* does not compel a different result. Although *Biestek* includes a passage noting that Social Security claimants "may probe the strength of [job-number] testimony by asking an expert about (for example) her sources and methods—where she got the information at issue and how she analyzed it and derived her conclusions," *Biestek* does not hold a reviewing court must order reversal whenever a VE's testimony on those topics is vague or whenever the ALJ curtails the scope of the examination. *Id.* at 1156-57. To the contrary, the narrow holding of *Biestek* is that an ALJ may rely on a VE's job-number calculations even when the VE refuses to produce the data on which those calculations are based. *Id.* at 1157 ("Where Biestek goes wrong . . . is in pressing for a categorical rule, applying to every case in which a vocational expert refuses a request for underlying data. . . . Even though the applicant might wish for the data, the

---

[4] In addition to finding that the VE's testimony was reliable in light of the VE's knowledge and experience, the ALJ also made various statements suggesting that the VE had adequately explained his methodology. (AR at 16 ["[T]he undersigned finds the vocational expert's methodology sound and in keeping with the [SSA's] policy."]; *id.* at 70 ["The VE has explained his methodology."].) For the reasons stated in the body of this order, the Court tends to agree with Plaintiff's contention (Doc. 18 at 3) that substantial evidence does not support the ALJ's statements on that topic. However, any error was harmless in light of the ALJ's identification of an alternative reason—knowledge and experience—for deeming the VE's job-number calculations reliable. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("We have long recognized that harmless error principles apply in the Social Security Act context.").

expert's testimony [may] clear (even handily so) the more-than-a-mere-scintilla threshold."). Thus, post-*Biestek*, the rule in the Ninth Circuit remains the same—an ALJ may accept the uncontradicted job-number calculations of a VE even when the VE fails to identify the methodology used to generate those calculations. *See, e.g.*, *Rashidi v. Kijakazi*, 2022 WL 17974638, *1-2 (9th Cir. 2022) (affirming ALJ's decision, even though "when Rashidi's counsel asked her on cross-examination to explain how she estimated job numbers, the VE was unable to identify a reliable methodology," because "the cursory nature of the VE's explanation of her methodology, alone, did not render her testimony unreliable" under *Biestek* and *Ford*); *Ward v. Comm'r of SSA*, 2023 WL 2425016, *7 (D. Ariz. 2023) ("While the VE's testimony as to his methodology could fairly be characterized as vague and would likely be strengthened by a more thorough explanation or provision of his underlying data, neither is required to clear the substantial evidence bar. Because this case is akin to *Rashidi*, which came after *Biestek* and accepted the VE's testimony as sufficient, the Court cannot say that the VE's testimony is unreliable such that the ALJ's reliance on it fails to meet the substantial evidence standard. As such, Plaintiff's challenge to the ALJ's step five determination is denied.").[5]

The second argument raised in Plaintiff's briefing is that ALJ's step-five analysis is flawed in light of the post-hearing evidence she submitted, which contradicted the VE's job-number calculations. The Ninth Circuit recently addressed a similar argument in *Wischmann*, so the Court begins there.

In *Wischmann*, the VE identified three jobs that a person with Wischmann's limitations could perform and also identified the number of such positions that were

---

[5] The Court notes that an expert's failure to identify the methodology used for generating his or her opinions would ordinarily serve as a bar to admissibility under Rule 702. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . . [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Robinson v. City of Montgomery*, 2005 WL 6743206, *3 (M.D. Ala. 2005) ("The plaintiffs' failure to disclose any underlying methodology for Rev. Vivian's opinion is fatal to his testimony."). But again, this is a Social Security appeal, not a *Daubert* challenge, and "an ALJ may receive evidence in a disability hearing that would not be admissible in court." *Biestek*, 139 S. Ct. at 1152 (cleaned up).

available nationwide: "bakery helper (59,000 positions nationwide), counter clerk (25,000 positions nationwide), and agricultural sorter (10,600 positions nationwide)." 68 F.4th at 501. When asked how he calculated those job figures, "the VE stated '[t]he software that we use is SkillTRAN Browser—Job Browser Pro.'" *Id.* Although the ALJ accepted this testimony at the time, Wischmann later sent a letter to the Appeals Council arguing that "the ALJ's finding that there were a significant number of jobs in the national economy that Wischmann could perform . . . was not supported by substantial evidence because . . . using Job Browser Pro the data shows that for bakery helper there are 45 positions nationally, for counter clerk there are 1,527 positions nationally, and for agricultural sorter there are 4,533 jobs nationally." *Id.* at 503 (cleaned up). In support of these assertions, Wischmann attached six pages of computer printouts. *Id.* However, these printouts did not "indicate the process by which the data were generated" and in some instances "the letter's statement of estimated job numbers [did] not correspond with the numbers in the printouts." *Id.* at 503-04. After the Appeals Council denied review, Wischmann appealed, arguing that "the ALJ improperly accepted the VE's testimony regarding the number of jobs in the national economy." *Id.* at 504. The Ninth Circuit rejected that argument and affirmed. As an initial matter, the court clarified that although an ALJ "may" have a "responsibility to resolve a conflict between the VE's job-number estimates and the claimant's job-number estimates," "[t]hat duty arises only where the purportedly inconsistent evidence is both significant and probative, as opposed to meritless or immaterial." *Id.* at 505 (cleaned up). Thus, the court began its inquiry by addressing whether the evidence presented by Wischmann was "probative." *Id.* at 506. The court held that Wischmann's evidence was not probative because, *inter alia*:

> The letter does not show that the data enclosed were produced using the same methodology as that used by the VE. The letter states only that Job Browser Pro produced a lower number of positions available nationally for baker, counter clerk, and agricultural sorter. But the letter provides no information about how the job numbers were produced, other than the name of the software program used. A software program, however, is merely a tool that must be used appropriately to produce reliable results. Given that

> SkillTRAN's Job Browser Pro software is meant to assist a VE in performing a complex matching exercise of various sources of information from official and private sources, experience in using the program and interpreting the output would ordinarily be necessary to produce probative results. But the letter does not state who produced the outputs—whether a VE with expertise in developing job numbers or the attorney himself, who has no identified expertise in calculating job figures in the national economy. Nor does the letter establish that the attorney replicated a methodology that was set forth by the VE at the hearing. In addition, the letter provides no information about what queries were entered into the computer program, what variables were changed, or what filters were applied to the data.

*Id.* at 506-07. The court concluded that "because the letter and attachments are not probative evidence, they do not give rise to the sort of inconsistency in the evidence that an ALJ is required to resolve. Therefore, there is no need to remand." *Id.* at 507 (citation omitted).

Here, as in *Wischmann*, the post-hearing evidence submitted by Plaintiff was not sufficiently "probative" to trigger a duty of reconciliation. As the Commissioner correctly notes, "Plaintiff merely submitted raw data from Job Browser Pro and Occupational Employment, and then offered her own lay interpretation of those numbers." (Doc. 17 at 4.) This was insufficient to contradict the VE's calculations in a manner that would require a more searching inquiry by the ALJ. *See also Lloyd v. Kijakazi*, 2023 WL 4044415, *1 (9th Cir. 2023) ("In *Wischmann*, the court explained that a letter from claimant's counsel and six pages of job-number printouts from SkillTRAN's Job Browser Pro software program did not constitute probative rebuttal evidence . . . . Here, Lloyd presents similar rebuttal evidence in the form of a letter from her counsel and six pages from Job Browser Pro. Like the claimant in *Wischmann*, Lloyd does not provide the context or explanations necessary to make her evidence a meaningful counter to the vocational expert's (VE) detailed testimony. Under *Wischmann*, Lloyd's evidence is not probative, and the ALJ had no duty to consider it.").

Before concluding, a point of clarification is necessary. In *Wischmann*, the Ninth Circuit held that the claimant's post-hearing evidence was deficient in part because the

- 14 -

claimant failed to "replicate[] a methodology that was set forth by the VE at the hearing." 68 F.4th at 507. Similarly, in *Lloyd*, the Ninth Circuit held that the claimant's post-hearing evidence was deficient in part because it lacked "the context or explanations necessary to make her evidence a meaningful counter to the [VE's] detailed testimony." 2023 WL 4044415 at *1. Although the Commissioner argues that Plaintiff's post-hearing evidence should be deemed deficient for the same reason—"[I]n the case at bar, Plaintiff . . . failed to replicate the methodology used by the vocational expert" (Doc. 17 at 4)—the Court disagrees. Because the VE never identified his methodology for deriving the job-number calculations, Plaintiff cannot be faulted for failing to replicate it. Nevertheless, Plaintiff's post-hearing evidence was still not "probative" in the manner required by *Wischmann*. For example, as for the "final assembler, optical goods" position, which the VE and ALJ identified as being associated with "approximately 35,000 jobs available nationally" (AR at 30), the post-hearing materials submitted by Plaintiff suggest, at most, that there is a large discrepancy between the number of jobs listed in the broader "Production Workers, All Other" category identified in the 2017 OEWS (256,050 jobs) and the number of jobs listed in SkillTRAN's Job Browser Pro (24 jobs). (AR at 399, 402.) These figures, on their own, do not contradict the VE's testimony because the VE acknowledged that the process of calculating job-number figures involves "a combination of information" from those two data sources (as well as the VE's spreadsheet). (*Id.* at 68-69.) Additionally, Plaintiff's counsel did not purport to identify any methodology for reconciling those figures—the post-hearing letter simply asserts, without foundation, that "it is highly improbable that the identified occupations comprise such a large percentage of the identified OEWS groups." (*Id.* at 392.) Such attorney argument does not constitute the sort of probative, contradictory evidence that would compel the ALJ to resolve the alleged conflict. *Cf. Kilpatrick*, 35 F.4th at 1194 ("[T]here is no basis to conclude that these results qualified as significant probative evidence that the ALJ was required specifically to address. Kilpatrick's attorney, Mr. Anderson, had no identified expertise in calculating job figures in the national economy . . . [and] there are obvious reasons to question Anderson's

methodology. Using 2011 data that was roughly seven years old at the time, Anderson took the total number of jobs in each OES group, divided by the number of DOT occupation titles within that group, and then multiplied it by the percentage of full-time jobs for the larger group. . . . Kilpatrick . . . identifies no support for her counsel's approach. Under all these circumstances, Anderson's submission was not significant probative evidence, and the ALJ did not err in not addressing it.").

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 12th day of October, 2023.

Dominic W. Lanza
United States District Judge